UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA DIVISION

| | |
|---|---|
| **CRAIG JALBERT** | **CIVIL ACTION NO. 23-505** |
| **VERSUS** | **JUDGE EDWARDS** |
| **RAYMOND JAMES & ASSOCIATES INC ET AL** | **MAG. JUDGE PEREZ-MONTES** |

## MEMORANDUM RULING & ORDER

Before the Court is a Motion for Summary Judgment (R. Doc. 24) filed by Raymond James & Associates, Inc. ("Raymond James"), George Longo ("Longo"), and Danyal Sattar ("Sattar") (collectively, "Defendants"). On June 19, 2019, Craig Jalbert, in his capacity as Chapter 11 Liquidating Trustee for German Pellets Louisiana, LLC ("GP") & Louisiana Pellets, Inc. ("LP") ("Plaintiff"), added Defendants as parties to an existing lawsuit and set forth new claims alleging that Defendants violated state securities law.[1] Defendants maintain that summary judgment is appropriate because the undisputed material facts establish that Plaintiff's claims prescribed before Defendants were added to this suit.[2] For the following reasons, Defendants' Motion is **DENIED**.

## BACKGROUND

This case concerns alleged misrepresentations surrounding the financing and failure of a wood pellet manufacturing facility in Urania, Louisiana (the "Project" or "Urania Facility").[3] While the Urania Facility was situated in Louisiana, its

---

[1] R. Doc. 24-3; R. Doc. 58-1 at 1, ¶ 1.
[2] R. Doc. 24-2 at 5-8.
[3] R. Doc. 24-4 at 2, 4 ¶ 9.

ownership and control traced back to entities based in Germany.[4] The Urania Facility was owned by LP and operated by GP – entities formed by Peter Leibold, his wife Anna Kathrin Leibold, and their son Michael Leibold (collectively, "the Leibolds").[5] Peter and Anna Kathrin Leibold controlled IPBG Pellets Beteiligungs GmbH ("LP Parent"), which owned all the outstanding common stock in LP.[6] The ultimate parent of LP Parent is the Pele Foundation, another entity controlled by the Leibolds.[7] They also owned GP's ultimate European parent company, German Pellets GmbH ("GP Parent").[8]

To finance the Project, the Louisiana Public Facilities Authority ("LPFA") issued five series of bonds— Series 2013A, Series 2013B-C, Series 2014A-B, Series 2015, and Series 2015A (collectively, the "Bonds").[9] In total, the five-bond series raised over $395 million in financing for the Project.[10] Raymond James acted as the initial purchaser and project advisor for each bond issuance.[11] Raymond James employees, including defendants Longo and Sattar, worked directly on the Project.[12] The Bonds were resold by Raymond James to sophisticated institutional investors (the "Bondholders").[13] The law firm Mintz, Levin, Cohn, Ferrish, Glovsky, and Popeo, P.C. ("Mintz Levin") served as purchaser's counsel for the Bondholders.[14] At the time,

---

[4] R. Doc. 24-4 at 6-7, ¶¶ 19-24.
[5] R. Doc. 24-4 at 6-7, ¶¶ 19-24.
[6] R. Doc. 24-4 at 6-7, ¶ 19.
[7] R. Doc. 24-4 at 19, ¶ 96; R. Doc. 58-1 at 6, ¶ 18.
[8] R. Doc. 24-4 at 6-7, ¶ 19.
[9] R. Doc. 24-4 at 11, ¶ 46.
[10] R. Doc. 24-4 at 2, ¶ 2.
[11] R. Doc. 24-4 at 11, ¶ 49, 14, ¶ 63.
[12] R. Doc. 24-4 at 21-22, ¶¶ 107-114.
[13] R. Doc. 58-1 at 3, ¶ 5.
[14] R. Doc. 24-19 at 11.

Wells Fargo served as bond trustee.[15]

Each bond issuance was accompanied by a Limited Offering Memorandum ("LOM") containing representations regarding the Project and its financing.[16] Raymond James, including Longo and Sattar, assisted in preparing the LOMs and assured the investors that it had performed adequate due diligence.[17] All LOMs, except for the first, represented that entities controlled by the Leibolds would contribute or had already contributed significant equity to the Project. For example, the 2013B and 2013C LOMs stated that approximately $37.26 million in equity had been contributed by LP and that an additional $20.1 million was to be contributed by LP Parent.[18] Subsequent LOMs covering the 2014A, 2014B, 2015, and 2015A bonds reaffirmed that $57.36 million in equity had been contributed as of December 5, 2013, aggregating the prior amounts.[19]

Despite the capital raised, the Project experienced significant delays and only began limited production in July of 2015.[20] Operations permanently ceased four months later in November 2015 after GP and LP failed to pay utility bills.[21] The Bonds defaulted shortly thereafter in early 2016.[22] UMB Bank ("UMB") became the post-default bond trustee.[23] In early February 2016, GP Parent informed Bondholders by email that delays were caused by weather conditions, material shortages, and

---

[15] R. Doc. 24-15 at 7.
[16] R. Doc. 24-4 at 4, ¶ 6.
[17] R. Doc. 24-4 at 13-18, ¶¶ 56, 66, 77, 87.
[18] R. Doc. 58-12 at 10-11.
[19] R. Doc. 58-13 at 14; R, Doc. 58-14 at 8; R. Doc. 58-15 at 9.
[20] R. Doc. 58-1 at 4, ¶ 9.
[21] R. Doc. 58-1 at 4, ¶ 9.
[22] R. Doc. 58-1 at 4, ¶ 10.
[23] R. Doc. 24-15 at 8.

concrete work.[24] On February 18, 2016, GP and LP filed for Chapter 11 bankruptcy in the Western District of Louisiana.[25]

Plaintiff, as the assignee of claims held by certain Bondholders, filed the present claim against Defendants on June 19, 2019, in his First Amended and Restated Petition for Damages and Injunctive Relief ("First Amended Petition").[26] Plaintiff subsequently filed his Second Amended and Restated Petition for Damages and Injunctive Relief ("Second Amended Petition") on January 29, 2021.[27]

In his Second Amended Petition, Plaintiff claims that the LOMs accompanying the Bonds contained material misrepresentations, either because the equity was never contributed or because any contributed funds were "immediately looted."[28] According to Plaintiff, these missing equity contributions were concealed from the Bondholders through two primary means. First, LP—allegedly with Raymond James' assistance—altered its disclosure obligations to avoid revealing 2014 audit results that would have revealed the missing equity.[29] Second, the Leibolds allegedly orchestrated a series of circular transactions designed to simulate the $37.26 million equity contribution (the "Equity Contribution Cover-Up").[30] The cover-up allegedly involved the transfer of exactly $37,262,449 from GP Parent to the Pele Foundation, to LP Parent, to LP, to GP, and back to GP Parent, all within the same Germany-

---

[24] R. Doc. 58-1 at 4, ¶ 12.
[25] R. Doc. 58-1 at 5, ¶ 14.
[26] R. Doc. 24-3.
[27] R. Doc. 24-4.
[28] R. Doc. 24-4 at 4, ¶ 6.
[29] R. Doc. 24-4 at 18-19, ¶¶ 89-94.
[30] R. Doc. 24-4 at 19-20, ¶¶ 95-98.

based bank, on the same day.[31] Plaintiff contends that Defendants violated the Louisiana Securities Act because they either knew or should have known of these misrepresentations and failed to disclose them.[32]

Defendants moved for summary judgment, reasserting the peremptory exception of prescription as it had done before the state court.[33] After its August 2021 hearing on the issue of prescription, the state court found that the Bondholders were not necessarily on inquiry notice of misrepresentations regarding equity contributions and denied the motion as to the equity-related claims.[34] This Court held a hearing on Defendants' Motion for Summary Judgment on June 9, 2025.[35] Defendants maintain that "[s]ummary judgment is warranted because the undisputed material facts establish Plaintiff's claims are prescribed for the two independent reasons that the [Bondholders] had both actual and constructive knowledge of the facts underlying the claims in 2016, more than two years before Plaintiff sued Defendants."[36]

## LEGAL STANDARD

Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[37] "[T]he plain language of Rule 56(c)

---

[31] R. Doc. 24-4 at 19, ¶ 96.
[32] R. Doc. 24-4 at 34, ¶ 196.
[33] R. Doc. 24-16.
[34] R. Doc. 24-16 at 24.
[35] R. Doc. 124.
[36] R. Doc. 24-2 at 5.
[37] Fed R. Civ. P. 56(a).

mandates the entry of summary judgment … against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[38]

The movant has the burden of pointing to evidence proving there is no genuine dispute as to any material fact, or the absence of evidence supporting the nonmoving party's case.[39] A dispute of material fact is genuine if evidence is such that a reasonable jury could return a verdict for the nonmoving party.[40] The inferences the court may draw from the underlying facts in the affidavits, depositions, and exhibits "must be viewed in the light most favorable to the party opposing the motion."[41]

"[T]he defense of prescription may . . . be raised by motion for summary judgment."[42] The movant must "prove, based solely on documentary evidence and without the benefit of testimony at a hearing, that there is no genuine material factual issue in dispute regarding the date upon which the plaintiffs acquired actual or constructive knowledge of the damage sufficient to commence the running of prescription."[43] If "there are no factual conflicts presented, only conflicting conclusions based on the facts," the question is appropriate for resolution by summary judgment.[44]

The prescriptive period under Louisiana Securities Law bars claims brought

---

[38] *Celotex Corp v. Catrett*, 477 U.S. 317, 322, 107 S. Ct. 2548, 91 L.Ed.2d 265 (1986).
[39] *Liberty Lobby, Inc.*, 477 U.S. at 250.
[40] *Liberty Lobby, Inc.*, 477 U.S. at 248.
[41] *McAvey v. Lee*, 260 F.3d 359, 363 (5th Cir.2001) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)).
[42] *Hogg v. Chevron USA, Inc.*, 2009-2632 (La. 7/6/10), 45 So. 3d 991, 997.
[43] *Hogg*, 45 So. 3d at 998.
[44] *Hogg*, 45 So. 3d at 999.

more than two years from the sale of the security.[45] The two-year period runs from the time a plaintiff (or plaintiff's assignor) knows of a cause of action or has notice of facts which, in the exercise of due diligence, should lead to the knowledge of a cause of action.[46] "The requisite knowledge, actual or constructive, needed to begin the running of the prescriptive period is merely that of the underlying facts, not that of the legal cause of action itself."[47] Additionally, courts in Louisiana follow the well-established rule that an agent's knowledge is imputed to the principal.[48]

Under Louisiana Securities Law, it is unlawful "to sell a security by means of any oral or written untrue statement of a material fact or any omission omitting to state a material fact necessary in order to make the statement … not misleading" provided that the buyer was unaware of the untruth or omission and could not have known it through the exercise of reasonable care.[49] Accordingly, prescription begins to run when a plaintiff has actual or constructive knowledge of such untrue statements or omissions of material fact.

## ANALYSIS

Plaintiff alleges that the LOMs contained untrue statements of material fact, or omissions of statements of material fact necessary to make those statements not

---

[45] *See* La. Stat. Ann. § 51:714(C)(1); Although Plaintiff raises these claims under Florida state law in the alternative, neither party has asked the Court to decide the applicable law at this time and the prescriptive period under both state laws is the same (*see GLK, L.P. v. Four Seasons Hotel Ltd.*, 22 So. 3d 635, 637 (Fla. Dist. Ct. App. 2009) ("Under section 95.11(4)(e), Florida Statutes, the limitations period for Chapter 517 violations is two years running from the time the facts give rise to the cause of action were discovered or should have been discovered with the exercise of due diligence.") (citations omitted)).
[46] *See Beckstrom v. Parnell*, 97-1200 (La. App. 1 Cir. 11/6/98), 730 So. 2d 942, 947.
[47] *Jensen v. Snellings*, 841 F.2d 600, 609 (5th Cir. 1988).
[48] *Bell v. Demax Mgmt. Inc.*, 824 So. 2d 490, 493 (La. App. 4 Cir. 7/24/02).
[49] La. R.S. 51:712(A)(2).

misleading, regarding equity contributions that were either never made or, if made, were looted.[50] Specifically, Plaintiff alleges that the LOMs misrepresented, *inter alia*, that: LP Parent contributed $37.26 million in equity prior to December 5, 2013; LP Parent contributed $20 million including a payment of $7.5 million to GP made on or around December 5, 2013, intended to fund working capital for the Urania Facility; LP Parent contributed $4 million of additional equity on or around August 4, 2014; GP Parent and LP Parent contributed additional equity of $9.57 million on or around May 20, 2025; and an additional $1.16 million of equity was contributed on or around July 20, 2015.[51]

Plaintiff first asserted claims against the Defendants on June 19, 2019.[52] Therefore, if the Bondholders or their agents (UMB or Mintz Levin) had actual or constructive knowledge of these alleged misrepresentations prior to June 19, 2017, the claims prescribed, and summary judgment is warranted in favor of Defendants.

### I.   Actual Knowledge

Defendants maintain that the Bondholders had actual knowledge that equity contributions had not been made in 2016.[53] In support of a finding of actual knowledge by 2016, Defendants rely on three key pieces of record evidence. First, on July 14, 2016, Norman Dittmar ("Dittmar"), financial controller for LP and GP sent Mintz Levin a spreadsheet detailing transactions between GP and GP Parent

---

[50] R. Doc. 24-4 at 32, ¶ 188.
[51] R. Doc. 24-4 at 32, ¶ 189.
[52] R. Doc. 24-3.
[53] R. Doc. 24-2 at 16.

("Spreadsheet").[54] The Spreadsheet reflects transfers from GP to GP Parent for $37.26 million on June 19, 2015, $12.8 million on December 10, 2013, and $7.67 million on January 10, 2014.[55] Second, Defendant claims that the Bondholders had actual knowledge of two of the transfers in the Equity Contribution Cover-up from the Statement of Financial Affairs ("SOFA") filed in the bankruptcy proceeding on May 4, 2016.[56] Finally, Defendants point to a claim that GP filed against GP Parent in a German insolvency proceeding in September of 2016, seeking to recover funds for the Project that had allegedly been looted.[57]

Defendants allege that the Bondholder's awareness of these transfers, which make up part of Plaintiff's Equity Contribution Cover-Up theory, and of GP's looting claim, alerted them to the alleged corporate looting, which in turn informed them of the missing equity contributions and thus constituted actual knowledge of the misrepresentations in the LOMs.[58] Plaintiff maintains that these transfers and any knowledge of post-bond issuance looting did not indicate that equity had not been contributed to the Project or reveal the misrepresentations because (1) transfers between GP and GP Parent in 2015 do not bear on contributions represented to be made two years earlier by LP Parent to LP and (2) the Spreadsheet and SOFA only reflect two of the five transfers that complete the Equity Contribution Cover-Up.[59]

The Court finds that the Bondholder's knowledge of intra-company transfers

---

[54] R. Doc. 24-2 at 16-17.
[55] R. Doc. 24-2 at 17.
[56] R. Doc. 24-2 at 19.
[57] R. Doc. 24-2 at 20.
[58] R. Doc. 24-2 at 18-19.
[59] R. Doc. 58 at 13-14.

is not equivalent to actual knowledge that the equity contributions were not made. Even if the Equity Contribution Cover-Up theory ultimately connects these transactions to a broader scheme to conceal the lack of equity, knowledge of post-issuance intra-company transfers does not, in and of itself, constitute notice that the specific equity representations in the LOMs were false. The same is true of GP's looting claims in the German insolvency proceedings. The fact that certain transfers may now be interpreted as part of a cover-up does not mean that Plaintiff or its agents understood them as such at the time. Therefore, the evidence presented does not demonstrate that Plaintiff had actual knowledge of the falsity of the equity contribution representations as of July 14, 2016.

Moreover, even if Mintz Levin was presented with the Spreadsheet and discussed "the details" of it with Dittmar, as alleged by Defendants,[60] the context and content of those discussions are critical. The Court finds no indication that Mintz Levin was made aware that the transfers reflected in the Spreadsheet were inconsistent with the equity contributions represented in the LOMs. Given the competing inferences that can be drawn from the Spreadsheet and the surrounding communications, there exists a genuine dispute of material fact as to whether the Bondholders, through their agents, had actual knowledge of the alleged misrepresentations before June 19, 2017. Summary judgment is therefore inappropriate on this ground.

---

[60] R. Doc. 24-2 at 17.

## II.   Constructive Knowledge

Defendants argue, in the alternative, that Plaintiff had constructive knowledge of the alleged equity misrepresentations no later than July 19, 2017.[61] Constructive knowledge is "whatever notice is enough to excite attention and put the injured party on guard or call for inquiry."[62] The point at which the prescription period begins to run is dependent "on the reasonableness of a plaintiff's action or inaction" taking into account his "education, intelligence, and the nature of the defendant's conduct." [63]

For securities cases, courts consider investors to have constructive knowledge (or inquiry notice) "when a reasonable investor of ordinary intelligence would have discovered the information and recognized it as a storm warning."[64] However, inquiry notice does not require the investor to have notice of the entire wrong.[65] An investor "who has learned of facts which would cause a reasonable person to inquire further must proceed with a reasonable and diligent investigation, and is charged with the knowledge of all facts such an investigation would have disclosed."[66] If "there are no factual conflicts presented, only conflicting conclusions based on the facts," the

---

[61] R. Doc. 24-2 at 20.
[62] *Hogg*, 45 So. 3d at 997.
[63] *Bordelon v. Wells Fargo Fin. La. LLC*, No. 18- 2563, 2018 WL 4095121, at *3 (E.D. La. Aug. 28, 2018) (quoting *Jordan v. Emp. Transfer Corp.*, 509 So. 2d 420, 423 (La. 1987)); *Robert v. Robert Mgmt. Co.*, LLC, 2014-0822 (La. App. 4 Cir. 2/11/15), 164 So. 3d 922, 934, writ denied, 2015-0541 (La. 5/22/15), 170 So. 3d 984.
[64] *Firefighters Pension & Relief Fund of New Orleans v. Bulmahn*, 53 F. Supp. 3d 882, 899 (E.D. La. 2014) (citation omitted).
[65] *See Firefighters Pension*, 53 F. Supp. 3d at 899 ("An investor need not have notice of the entire wrong being perpetrated to be on inquiry notice."); *see also Jensen*, 841 F.2d at 607.
[66] *Jensen*, 841 F.2d at 607 (holding that "[i]nvestors are not free to ignore 'storm warnings' which would alert a reasonable investor to the possibility of fraudulent statements or omissions in his securities transaction.").

question of whether a plaintiff had constructive knowledge is appropriate for resolution by summary judgment.[67]

Defendants offer four primary bases to support a finding of constructive knowledge.[68] Plaintiff contends that even if these "various pieces of information" put Bondholders on inquiry notice of their claims, Defendants offer no evidence to show when, after receipt of that information, a reasonably diligent bondholder would have discovered the facts supporting the claims asserted in this suit.[69]

### A.   Knowledge of Alleged Looting

Defendants assert that the Bondholders knew, as early as mid-2016, of the transfers now characterized as evidence of looting.[70] They again point to Dittmar's 2016 communications with Mintz Levin, in which he attached the Spreadsheet and offered to discuss its details, and to the SOFA showing a $37.26 million back-and-forth transfer between GP and GP Parent.[71] Plaintiff acknowledges that the Spreadsheet and the SOFA disclosed two "legs" of the Equity Contribution Cover-Up, but contends that Defendants overstate the implications of the Bondholder's early knowledge of looting.[72] Plaintiff maintains that reasonable diligence did not, and could not, reveal the missing equity earlier, especially since neither GP nor GP Parent were parties to the contributions represented in the LOMs.[73]

Defendants fail to show that receipt of the Spreadsheet or SOFA, without more,

---

[67] *Hogg*, 45 So. 3d at 999.
[68] R. Doc. 24-2 at 20-21.
[69] R. Doc. 58 at 18.
[70] R. Doc. 24-2 at 24-27.
[71] R. Doc. 24-2 at 24-25.
[72] R. Doc. 58 at 22-25.
[73] R. Doc. 58 at 23-25.

would have led a reasonable investor to uncover the specific equity misrepresentations in the LOMs. The Bondholders actively investigated these intercompany transfers and the financial conditions of the Project during the bankruptcy, yet did not discover the missing equity until 2018.[74] Moreover, Defendants themselves maintained until at least 2022 that equity contributions had been made.[75] The argument that the Bondholders should have discovered missing funds that Defendants themselves did not uncover lacks merit.

### B. Consideration of Claims Against Raymond James for "Underwriter Liability"

Next, Defendants cite a February 2016 email in which one of the Bondholder's director reported that municipal bondholders were "thinking of going after [Raymond James] for underwriter liability."[76] Defendants contend that this shows that the Bondholders were already aware of the alleged misconduct at issue in this case and establishes that they were, at a minimum, on inquiry notice of potential claims against Defendants as far back as 2016.[77] Plaintiff asserts that the Bondholders were reasonably investigating potential claims in 2016 but had not uncovered facts sufficient to support these claims.[78] Testimony from the Bondholders confirms ongoing efforts to understand the Project's failure and that their investigation pointed to market conditions and operational delays, not misrepresentations in the LOMs.[79]

---

[74] R. Doc. 58 at 24.
[75] R. Doc. 58 at 20.
[76] R. Doc. 24-2 at 23.
[77] R. Doc. 24-2 at 23.
[78] R. Doc. 58 at 21-22.
[79] R. Doc. 58 at 21-22 (stating that one representative testified that in June 2017 he was still

The Court agrees with Plaintiff. Speculative discussion of "underwriter liability" does not constitute constructive knowledge of the specific equity misrepresentations alleged here. Because Bondholders' discussions of underwriter liability did not lead them to discover the facts supporting their claims asserted in this suit, Defendants have not established the absence of a genuine fact dispute that that the prescriptive period began on or about a certain day as a matter of law.

### C.     Allegations of Fraud

Defendants also argue that the Bondholders has constructive knowledge of their claims because they knew by March or April 2016 that GP Parent and Peter Leibold were under investigation for fraud and embezzlement.[80] They cite trustee UMB's awareness of media reports and contend this should have triggered inquiry into related fraudulent conduct, including the equity misrepresentations.[81] Plaintiff counters that the evidence shows only vague reports that Leibold was "under suspicion" in Germany and not specific allegations relating to the Project.[82] Further, the Bondholders claim to have investigated Leibold's conduct in response to these reports but did not uncover any misstatements regarding equity contributions.[83]

These facts are distinguishable from Defendants cited case, *Moore v. A.G.*

---

"continuing to investigate what went wrong." At that time, he was aware of "the parent company's financial distress," but his investigation had pointed only to falling oil prices, falling pellet prices and usage, and missed liquidated damages and interest payments. Similarly, another representative testified there were conversations between bondholders and the bond trustee about how to "enforce [thei]r rights and remedies" and "[m]aximizing recovery," but despite this investigation, he did not learn until 2018 that the $37.26 million equity amount set forth in the 2013B-C LOMs was not contributed.)

[80] R. Doc. 24-2 at 27.
[81] R. Doc. 24-2 at 27.
[82] R. Doc. 58 at 25.
[83] R. Doc. 58 at 25-26.

*Edwards & Sons*, where the investor read a news article describing the exact misrepresentation at issue.[84] Here, the articles referenced by Defendants did not implicate the equity contributions or the LOMs.[85] Moreover, unlike the Plaintiff in *Moore*, the Bondholders did investigate these concerns and still failed to uncover the equity misstatements. The Court finds that this evidence also does not establish constructive knowledge commenced the running of prescription on a certain date as a matter of law.

### D.  Other Misrepresentations in the LOMs

Finally, Defendants argue that bondholders knew in 2016 that the LOMs contained false information about a supposed offtake agreement with another company.[86] They contend this should have prompted further investigation into other potential misstatements, including the equity contributions.[87] Plaintiff notes that the state court already rejected this argument in 2021, holding that awareness of one misrepresentation does not, without more, impose a duty to investigate unrelated representations.[88] The Court declines to disturb the state court's ruling and agrees that knowledge of one misrepresentation does not, as a matter of law, impute knowledge of others, especially considering the distinct and complex issues raised by the equity contributions. Without evidence that discovery of the offtake agreement misrepresentation would have uncovered the equity misstatements, Defendants'

---

[84] R. Doc. 24-2 at 28 (citing *Moore v. A.G. Edwards & Sons, Inc.*, 631 F. Supp. 138, 143 (E.D. La. 1986)).
[85] R. Doc. 58 at 25-26.
[86] R. Doc. 24-2 at 29.
[87] R. Doc. 24-2 at 29.
[88] R. Doc. 58 at 27-28.

argument fails.

Even contemplating all four theories of constructive knowledge as a sort of factual mosaic, Defendants have not demonstrated that the Bondholders had constructive knowledge of the equity misrepresentations before 2018. At most, the evidence shows that the Bondholders were actively investigating the Project's collapse and still did not discover the missing equity contributions.

## ORDER

For the foregoing reasons,

**IT IS ORDERED** that the Motion for Summary Judgment (R. Doc. 24) filed by Raymond James & Associates, Inc., George Longo, and Danyal Sattar, is hereby **DENIED**.

**THUS DONE AND SIGNED** on this 30th day of June 2025.

**JERRY EDWARDS, JR.**
**U.S. DISTRICT JUDGE**